TRAVELERS' INS. CO. OF HARTFORD v. RANDOLPH.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1897.)

No. 439.

1. TRIAL—PEREMPTORY INSTRUCTION—WAIVER.
The failure of a defendant, at the close of the plaintiff's evidence, to ask a peremptory instruction, will not of itself preclude such a motion at the close of the whole evidence.

2. SAME—WHEN GIVEN.
A peremptory instruction should not be given to a jury unless, upon a survey of the whole evidence, and giving effect to every inference to be fairly or reasonably drawn from it, the case is palpably for the party asking such instruction; and a case cannot properly be withdrawn from the jury because, in the judgment of the court, there is a preponderance of evidence in favor of the party asking such instruction. Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463, reaffirmed.

3. ACCIDENT INSURANCE—EXCEPTIONS FROM RISK—VOLUNTARY EXPOSURE.
The expression "voluntary exposure to unnecessary danger," used in stating the exceptions to the liability of an insurance company upon an accident policy, refers only to dangers of a real, substantial character, which the insured recognized, but to which he, nevertheless, purposely and consciously exposed himself, intending at the time to assume all the risks of the situation.

4. SAME—QUESTION FOR JURY.
Under a policy of accident insurance, which expressly declares that the insurance does not cover entering or trying to enter or leave a moving conveyance using steam as a motive power, and which also excepts injuries due to voluntary exposure to unnecessary danger, voluntary riding upon the platform of a rapidly moving railroad car, though there may be no necessity therefor, is not, in itself and as matter of law, a voluntary exposure to unnecessary danger, but presents a question of fact to be determined by the jury under all the evidence.

5. SAME—NEGLIGENCE OF INSURED.
Cases determining that certain acts constitute contributory negligence, such as to defeat a recovery for personal injuries claimed to have been caused by the negligence of another, have no application to actions upon accident insurance policies which do not in terms exempt the insurer from liability for injuries caused by the negligence of the insured, since the liability upon such policies depends upon contract, and the negligence of the plaintiff is no defense unless expressly made so.

**6. SAME.**

Where an accident insurance policy exempts the insurer from liability for injuries received while violating rules of a corporation, it is proper, in an action on the policy, to leave to the jury, upon all the evidence, the question whether the insured knew of a rule of a corporation which it is claimed he was violating when injured, and to charge them that, in order for the insured to be bound by the rule, it must be one which the corporation enforced or used reasonable effort to enforce.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

J. K. Flippin and Luke E. Wright, for plaintiff in error.

Geo. Randolph, Samuel Holloway, and Wm. M. Randolph, for defendant in error.

Before HARLAN, Circuit Justice, LURTON, Circuit Judge, and SAGE, District Judge.

HARLAN, Circuit Justice. This is an action upon insurance contracts evidenced by an annual policy and two accident tickets issued to Albert G. Mitchell by the Travelers' Insurance Company of Hartford, Conn. There were a verdict and judgment for the plaintiff.

By its policy of June 5, 1894, that company insured Mitchell, a bookkeeper by occupation, in the sum of $50 per week, against loss of time, not exceeding 26 consecutive weeks, resulting from bodily injuries effected through external, violent, and accidental means, which should, independently of all other causes, immediately and wholly disable him from transacting any kind of business pertaining to his occupation. If death ensued from such injuries alone within 90 days, then the company agreed to pay the sum of $10,-000 to the legal representatives of the assured. But the policy declared that the insurance did not cover "disappearance; nor suicide, sane or insane; nor injuries of which there is no visible mark on the body (the body itself in case of death not being deemed such mark); nor accident, nor death, nor loss of limb or sight, nor disability, resulting wholly or partly, directly or indirectly, from any of the following causes, or while so engaged or affected: Disease or bodily infirmity; hernia; fits; vertigo; sleep-walking; medical or surgical treatment, except amputations necessitated solely by injuries, and made within ninety days after accident; intoxication or narcotics; voluntary or involuntary taking of poison, or contact with poisonous substances, or inhaling of any gas or vapor; sunstroke or freezing; dueling or fighting; war or riot; intentional injuries (inflicted by the insured or by any other person); voluntary overexertion; violating law; violating rules of a corporation; voluntary exposure to unnecessary danger; expeditions into wild and uncivilized countries; entering or trying to enter or leave a moving conveyance using steam as a motive power, except cable cars; riding in or on any conveyance not provided for transportation of passengers; walking or being on a railway bridge or roadbed (railway employés excepted)."

The same provisions, substantially, are set forth in the accident tickets issued by the company.

The defendant pleaded that it did not owe the plaintiff in manner and form as alleged, and that proper proofs of death were not furnished.

It also pleaded: That the assured committed suicide on the 9th day of November, 1894, by "voluntarily, and with intent to take his life, jumping off" a train of cars, en route from St. Louis to Memphis, Tenn., and which at the time was moving 35 miles an hour, he being a passenger on such train.

That the assured "intentionally and of a purpose sprang or jumped" from said train, with the intent of inflicting injury upon himself, and, as a result thereof, he was dashed against the ground with great violence, receiving injuries from which he shortly afterwards died.

That when the train approached Memphis, at the rate of 35 miles an hour, the assured voluntarily and unnecessarily left his seat in the sleeping car, where he was safe and free from danger, and went out of such car and upon its platform, thence to the rear platform of the next car ahead, thence to the lower step of the last-named platform, the same being a very dangerous place, from which, by any sudden jar or movement of the car, he was liable to fall or be thrown from the train; that, in standing on said lower step of the platform, it was necessary for him to hold to the hand railing provided on each side for the use of persons getting off and on the car; that while in that position, the cars moving at a high rate of speed, he was in great danger of losing his hold by reason of the moving of the car or from other causes, and of being thrown from the step, and injured or killed, "all of which danger was obvious and well known to the said Mitchell"; that the assured went into said place of great and unnecessary danger without any reasonable cause therefor, and, while there, "fell or sprang" from the car step, receiving great injuries, from which he shortly died; and that, by reason of this voluntary exposure of the assured to unnecessary danger, the contract of insurance between him and the defendant did not attach or become operative, nor cover the injuries and resulting death of the assured.

That the insured, while the car was moving at the rate of 35 miles an hour, attempted to leave, and did leave, the same, by "stepping or leaping" therefrom, and thereby he was thrown to the ground with great violence, and received injuries from which he shortly thereafter died.

That while standing upon the lower step of the rear platform of the car immediately in front of the sleeping car, as above stated, the insured was intoxicated, and, being so intoxicated, either "fell or sprang" from such step when the car was moving at the above rate of speed, and was dashed violently against the ground, receiving fatal injuries, from which he shortly died. And

That the assured came to his death by reason of his standing upon the platform, as above stated, in violation of a rule of the railroad company which was then, and had been for many years,

in force, forbidding passengers to stand or ride on the platforms of its cars while they were in motion.

The plaintiff filed replications, which put in issue all the material facts set out in the several pleas.

Mitchell was a resident of the city of Memphis, where for many years prior to his death he had been employed as a bookkeeper. He was unmarried, about 46 years of age, and lived with a widowed sister and her children in that city. It seemed to have been his habit when traveling any distance on railroads to buy accident tickets, and, when his relatives went from home, he bought tickets of that kind for them.

He left Memphis in June, 1894, to go to St. Louis, holding at the time two annual accident policies for $10,000 each, namely, the one here in suit, issued by the Travelers' Insurance Company, and the other issued by the Fidelity & Casualty Company. Before leaving home, he increased his accident insurance by buying $18,000 of tickets that were good for a few days only, and left them in a package addressed to W. M. Randolph, his attorney, with a writing appointing the latter as his executor, without bond or report, and directing the disposition of the above sum. This package was found, after his death, in the safe of the Hill Shoe Company, of which he was assignee.

It does not appear what particular object Mitchell had in going to St. Louis, nor what he did while in that city. He remained there about five months. While there, he bought the accident insurance tickets in suit. One of the persons who sold him the tickets testified that he did not know that Mitchell would have bought so much insurance if he (the insurance agent) had not forced it upon him. Before leaving St. Louis he placed his insurance policies in an envelope addressed to W. M. Randolph, his attorney at Memphis, and sent the package by express. He also telegraphed to W. M. Randolph & Sons from St. Louis: "Leave to-night on Chesapeake & Ohio. Will be at your office to-morrow at 9."

He left St. Louis for his home on the evening of the 8th of November, 1894, and was due at Memphis at 7:55 the next morning. The train on which he traveled was composed of a sleeping car, two ordinary passenger cars, and a baggage car. He occupied a seat in the sleeping car. He arose quite early on the morning of the 9th, and was seen several times standing on the platform of the cars, while the train was moving 15 to 25 miles an hour. At one time he stood with both feet on the platform, and with his back against the side of the door of the car. At another time, according to some of the evidence, he held onto the railing, with one foot on the platform, and the other on the top step of the platform.

The colored porter of the sleeping car was examined as a witness for the defendants. He testified that he first saw Mitchell, the morning of the 9th, standing on the platform of one of the coaches, when the train was about 25 miles from Memphis; that he heard the deceased ask the conductor several times how far

it was to Memphis; and that, when he came out to wipe off the hand rails of the car, Mitchell and a little boy were on the platform together, Mitchell standing on the lower step, and the boy just going into the door of the ladies' coach. The witness said that Mitchell, when last seen by him, was on the lower step, holding with one hand to the rail attached to the body of the car, and with the other to the platform railing, "one foot up like a man going to jump off, and the other foot on the lower step,"—"standing like a railroad man who was going to jump off." He also testified that in about "a minute or a half minute, a short time," he observed that Mitchell "let all hold go, and fell back; released his hold, and went back"; that he rushed to the front of the car, to find the conductor, and report what had occurred; that the train was immediately stopped, and was backed, until it came to the place where Mitchell was lying across a side track; that the body was at once put into a baggage car, and Mitchell died in a few minutes thereafter, just before the train reached Memphis.

The little boy who was seen by the porter on the platform with Mitchell was 13 years old at the time. In his deposition he stated that he went into the car to warm his hands, and "came back to the door, and he [Mitchell] was not there"; that he went back to the stove, and in a few minutes the porter came running in, and said something about a man falling off.

It is proper here to observe that the sleeping-car porter was the only witness who testified that Mitchell, while on the platform, and just before he disappeared from the train, was in the attitude of a person about to jump from the moving car. The jury might well have concluded, from his examination as a witness, that he was mistaken upon that point, and that there was nothing in Mitchell's conduct indicating a purpose to put his life in peril by jumping or throwing himself from the train. But there was no room to doubt that Mitchell was riding on the platform while the train was moving at the rate of from 15 to 30 miles an hour.

At the close of the evidence, the defendant moved the court for a peremptory instruction in its behalf, assigning as the ground of the motion that Mitchell "voluntarily exposed himself to unnecessary danger, and that his injury and consequent death resulted therefrom." This motion was overruled, and an exception was taken by the defendant.

The first proposition by the plaintiff is that the evidence in his behalf made a case which, in the absence of all other testimony, entitled him to a verdict, and as the defendant elected to introduce testimony in its own behalf, the court was without authority, at the close of the evidence on both sides, to direct a verdict for the defendant.

The authorities cited do not sustain this proposition. It is well settled that if, at the close of the plaintiff's evidence, the court refuses to give a peremptory instruction for the defendant, such refusal cannot be assigned for error if the defendant does not stand upon the case made by the plaintiff, but introduces evidence in support of his defense. Railway Co. v. Cummings, 106 U. S.

700, 1 Sup. Ct. 493; Insurance Co. v. Crandal, 120 U. S. 527, 530, 7 Sup. Ct. 685; Railroad Co. v. Hawthorne, 144 U. S. 202, 206, 12 Sup. Ct. 591; Campbell v. City of Haverhill, 155 U. S. 610, 612, 15 Sup. Ct. 217; Railway Co. v. Callaghan, 161 U. S. 91, 95, 16 Sup. Ct. 493. But the failure of a defendant, at the close of the plaintiff's evidence, to ask a peremptory instruction, will not, of itself, preclude such a motion at the close of the whole evidence. It often occurs that the evidence on behalf of a defendant, in connection with that on behalf of the plaintiff, will justify a peremptory instruction to find for the defendant, when such an instruction would not have been authorized by the prima facie case made by the plaintiff's proofs.

The circumstances under which a court may withdraw a case from the jury have been elaborately discussed by counsel. The rule upon that subject has been defined in recent adjudications. The thought intended to be expressed in them is that the jury should be permitted to return a verdict according to its own view of the facts, unless upon a survey of the whole evidence, and giving effect to every inference to be fairly or reasonably drawn from it, the case is palpably for the party asking a peremptory instruction. A mere scintilla of evidence in favor of one party does not entitle him, of right, to go to the jury. Improvement Co. v. Munson, 14 Wall. 442, 448. On the other hand, a case cannot properly be withdrawn from the consideration of the jury simply because, in the judgment of the court, there is a preponderance of evidence in favor of the party asking a peremptory instruction. If the facts are entirely undisputed or uncontradicted, or if, upon any issue dependent upon facts, there is no evidence whatever in favor of one party, or, what is the same thing, if the evidence is so slight as to justify the court in regarding the proof as substantially all one way, then the court may direct a verdict according to its view of the law arising upon such a case. If a verdict is rendered contrary to the evidence, the remedy of the losing party is a motion for a new trial. In disposing of that motion, the court, in the exercise of a sound legal discretion, may interpose and prevent the injustice that may be done by such a verdict. While the court may instruct the jury as to the law arising upon a given or hypothetical state of facts, it is for the jury, if the facts are disputed, or if there is substantial evidence both ways, even if there be a preponderance of evidence one way, to say what facts are established. And this is what was meant by the observation in some cases that the court should not withdraw from the jury a case depending upon the effect or weight of testimony, unless the evidence should be of such conclusive character as to compel the court to set aside a verdict returned in opposition to it. Insurance Co. v. Doster, 106 U. S. 30, 32, 1 Sup. Ct. 18. The court may be of opinion that, according to the weight of the testimony, a verdict should be returned for the party asking a peremptory instruction. But it may not, for that reason alone, give such an instruction. It may not take the case from the jury, on issues of fact, unless the evidence is so distinctly all one way that a different view of it would shock

the judicial mind. Hence it has been held in an action for damages against a railroad company—one of the issues being the contributory negligence of the plaintiff—that the court erred in not submitting the question of contributory negligence to the jury, where the conclusion did not follow, as matter of law, that no recovery could be had upon any view that could be properly taken of the facts. Kane v. Railway Co., 128 U. S. 91, 9 Sup. Ct. 16; Jones v. Railroad Co., 128 U. S. 443, 9 Sup. Ct. 118. To the same effect are Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679; Railroad Co. v. Powers, 149 U. S. 43, 13 Sup. Ct. 748; Gardner v. Railroad Co., 150 U. S. 349, 361, 14 Sup. Ct. 140; Railroad Co. v. Everett, 152 U. S. 107, 113, 14 Sup. Ct. 474.

The general question was considered in the recent case of Sparf v. U. S., 156 U. S. 51, 99, 15 Sup. Ct. 273. Referring to the rule defining the respective functions of court and jury in a case where there is some substantial evidence to support the particular right asserted, and in a case in which there is an entire absence of evidence to establish such right, the court said:

"In the former class of cases the court may not, without impairing the constitutional right of trial by jury, do what, in the latter cases, it may often do without intrenching upon the constitutional functions of the jury. The law makes it the duty of the jury to return a verdict according to the evidence in the particular case before them. But, if there are no facts in evidence bearing upon the issue to be determined, it is the duty of the court, especially when so requested, to instruct them as to the law arising out of that state of the case. So, if there be some evidence bearing upon a particular issue in a cause, but it is so meager as not, in law, to justify a verdict in favor of the party producing it, the court is in the line of duty when it so declares to the jury. Pleasants v. Fant, 22 Wall. 116, 121; Montclair v. Dana, 107 U. S. 162, 2 Sup. Ct. 403; Randall v. Railroad Co., 109 U. S. 478, 482, 3 Sup. Ct. 332; Schofield v. Railway Co., 114 U. S. 615, 619, 5 Sup. Ct. 1125; Marshall v. Hubbard, 117 U. S. 415, 419, 6 Sup. Ct. 806; Meehan v. Valentine, 145 U. S. 611, 625, 12 Sup. Ct. 972."

See, also, Gunther v. Insurance Co., 134 U. S. 110, 116, 10 Sup. Ct. 448.

Our re-examination of this question has been in deference to the arguments of learned counsel. It should be observed, however, that the subject was very carefully considered by this court in Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463. Upon a full review of the American and English authorities, this court, speaking by Judge Lurton, announced these propositions: That there must be something more than a scintilla of evidence supporting the case of the party upon whom the burden of proof rests, to require the submission of the case to the jury; that where there is a real conflict of evidence on a question of fact, whatever may be the opinion of the judge who tries the case as to the value of that evidence, he must leave the consideration of it for the decision of the jury; that where there are material and substantial facts which, if credited by the jury, would in law justify a verdict in favor of one party, it is not error for the trial judge to refuse a peremptory instruction to the jury; that it is not a "proper standard to settle for a peremptory instruction that the court, after weighing the evidence in the case, would, upon motion for a new

trial, set aside the verdict," and that the court "may, and often should, set aside a verdict, when clearly against the weight of the evidence, where it would not be justified in directing a verdict"; that, upon reason and authority, "there is a difference between the legal discretion of the court to set aside a verdict as against the weight of evidence, and that obligation which the court has to withdraw a case from the jury, or direct a verdict for insufficiency of evidence"; and that "in the latter case it must be so insufficient in fact as to be insufficient in law."

Guided by the rules laid down in the adjudged cases, we proceed to inquire whether the circuit court should have sustained the defendant's motion for a peremptory instruction to find in its favor. The court was undoubtedly entitled to assume that Mitchell left his seat in the car, and rode many miles on the platform while the train was running at considerable speed. The evidence to that effect was entirely uncontradicted. The only doubt that could arise in reference to the facts was whether, as stated by the colored porter, the assured stood on the lower step of the platform, and jumped or threw himself from the train. If the case depended upon the accuracy of this statement, the court, in view of all the evidence, could not properly have directed a verdict for the defendant without usurping the functions of the jury, and without infringing the constitutional right of the plaintiff to a trial of his case by a jury. The porter's statement that Mitchell jumped from the steps of the platform bore directly on the issue as to suicide. That question was fairly submitted to the jury, and their verdict was, in legal effect, a finding that he did not commit suicide; and we may here observe that the averment in one of the pleas that Mitchell was intoxicated was entirely unsupported by the evidence.

But the defendant's motion for a peremptory instruction distinctly presented the question whether riding upon the platform of a car running 15 to 25 or 30 miles an hour, even if the passenger, while so riding, holds to a railing, and thereby diminishes the danger of being thrown from the car, was, within the meaning of the policy and as matter of law, a voluntary exposure of himself to unnecessary danger. The principal contention of the defendant is that the jury should have been so instructed.

What do the words "voluntary exposure to unnecessary danger" in the contracts in suit import?

In National Bank v. Insurance Co., 95 U. S. 673, 679, it was said that, if a policy of fire insurance was so framed as to leave it doubtful whether the parties intended the exact truth of the applicant's statements to be a condition precedent to a binding contract, the court should lean against a construction that imposes upon the assured the obligations of a warranty. "Its attorneys, officers, or agents," the court observed, "prepared the policy for the purpose, we shall assume, both of protecting the company against fraud, and of securing the just rights of the assured under a valid contract of insurance. It is its language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself." The same rule was rec-

ognized in Thompson v. Insurance Co., 136 U. S. 287, 297, 10 Sup. Ct. 1019, which was a case of fire insurance, and was upheld in Insurance Co. v. McConkey, 127 U. S. 661, 666, 8 Sup. Ct. 1360, as applicable in a case of life insurance. This court enforced the same rule in Indemnity Co. v. Dorgan, 16 U. S. App. 290, 309, 7 C. C. A. 581, and 58 Fed. 945, where this court, speaking by Judge Taft, said that all language in life policies limiting the liability of the company should be construed favorably for the insured; that all doubts or ambiguities should be resolved against the insurer.

The words "voluntary exposure to unnecessary danger," literally interpreted, would embrace every exposure of the assured not actually required by the circumstances of his situation, or enforced by the superior will of others, as well as every danger attending such exposure that might have been avoided by the exercise of care and diligence upon his part. But the same words may be fairly interpreted as referring only to dangers of a real, substantial character, which the insured recognized, but to which he nevertheless purposely and consciously exposed himself, intending at the time to assume all the risks of the situation. The latter interpretation is most favorable to the assured, does no violence to the words used, is consistent with the object of accident insurance contracts, and is therefore the interpretation which the court should adopt. One of the accepted meanings of the word "voluntary" is "done by design or intention; purposed; intended." Webst. Dict. Judge Clark, who presided at the trial, instructed the jury that:

"Mere negligence or inattention is not an exposure to danger within the meaning of the policy,—mere thoughtlessness,—but it requires a degree of appreciation of danger at the time to make it voluntarily assumed, and a voluntary exposure. * * * If you find that standing on the platform, under all circumstances of this case, taking into account his position on the train, the speed of the train, the track, and everything else that makes up the situation where the accident occurred, if you find that that was dangerous, and that, being conscious of that danger, he took a position that exposed him to it, and death resulted, your verdict should be for the defendants, otherwise for the plaintiff, as to that issue."

The company was not entitled to a more favorable interpretation of the contract than this instruction indicated.

This interpretation is in harmony with other clauses of the written contract. For instance, the company insured against "bodily injuries," effected through external, violent, and accidental means, which, independently of all other causes, immediately and wholly disabled the assured from transacting business pertaining to his occupation as a bookkeeper, but expressly excepted "intentional injuries, inflicted by the insured or any other person." A bodily injury, therefore, not intentionally inflicted upon the assured, but which may have been due wholly to negligence or thoughtlessness, was covered by the contract; and it is equally clear that, if death ensued from bodily injuries resulting from such negligence or thoughtlessness, the case would be covered by the contract. But is it to be supposed that the contract included a case of death from bodily injuries inflicted by the accused upon himself carelessly, but not intentionally, and yet that death, resulting from a careless or

negligent exposure of the assured to unnecessary danger, with no intention upon his part to commit suicide or to injure himself, was excepted from the operation of the policy? This question must be answered in the negative; and such an answer means that, looking at the whole contract, the words "voluntary exposure to unnecessary danger" are to be held as importing an exposure by the assured to unnecessary danger, with the intention or design at the time to risk the consequences of such exposure.

In Miller v. Insurance Co., 92 Tenn. 167, 187, 21 S. W. 39, which was a suit upon an accident policy, exempting the company from liability where the injury resulted from "voluntary exposure to unnecessary danger," the court held that these words were not "the entire equivalent of 'ordinary negligence,'" and that "a degree of consciousness of danger is necessary before there would be that voluntary exposure to unnecessary danger required to prevent indemnity."

In Keene v. Association, 164 Mass. 170, 41 N. E. 203, which was an action upon a policy of life insurance, exempting the company from liability when death or injury happened in consequence of voluntary exposure to unnecessary danger, hazard, or perilous adventure, the court said:

"A voluntary exposure to necessary danger is not forbidden, nor an involuntary exposure to unnecessary danger. * * * There are other dangers which one need not encounter, if he knows of their existence long enough beforehand, as, for example, a runaway horse or a coming car; and a mere inadvertent and unintentional exposure to a danger of this kind is not voluntary, but involuntary. A voluntary exposure to unnecessary danger implies a conscious intentional exposure,—something of which one is conscious, but willing to take the risk of. By taking a policy of insurance against accidents, one naturally understands that he is to be indemnified against accidents resulting in whole or in part from his own inadvertence. Great negligence will not necessarily defeat a fire policy. Johnson v. Insurance Co., 4 Allen, 388. And in the present policy against accidents, upon the evidence, although the jury might well find a voluntary exposure to danger, we cannot say that it would be bound, as matter of law, to do so."

In Follis v. Association, 62 N. W. 807, 809, the supreme court of Iowa held that "voluntary exposure to unnecessary danger," in a life insurance contract, means something more than contributory negligence, or the want of ordinary care on the part of the assured.

There are, it must be admitted, authorities that look the other way. But we are of opinion that the better reason is with the cases holding that the words "voluntary exposure to unnecessary danger," in accident policies such as the one here in suit, import a consciousness of the danger, and an intention to risk the consequences of exposing one's self to it. Whether, in the present case, the exposure was unnecessary, and whether the assured was aware of and appreciated the danger, and intentionally or purposely risked it, were questions of fact that were properly left for the determination of the jury under appropriate instructions by the court as to the law of the case. In making such determination, the jury were entitled to look at all the evidence, and, as a recognition of the danger and the intention of the assured to take the risk attending the situation may not unreasonably have been inferred

from the circumstances and from his acts, the jury were entitled to infer a voluntary exposure to unnecessary danger from any facts showing that he could not have failed to recognize the existence of the danger, and must have purposely or intentionally risked it.

Before leaving this part of the case, it is proper to refer to the action of the circuit court touching certain special requests by the defendant for instructions.

The defendant asked the court to instruct the jury that if they found "that Albert G. Mitchell was an intelligent man, accustomed to railroad traveling, and while in the exercise of his own free will, and without any necessity therefor, was standing upon the platform of the car with his hands in his pockets, or upon the steps of the platform of said car, while in a train propelled by steam, and running at a speed of about twenty-five miles an hour, then this will be a 'voluntary exposure to unnecessary danger,' in the sense of the policies; and, if death resulted from the same, you will find for the defendants." This instruction was properly refused, because it assumed that the conduct of Mitchell, as described in the proposed instruction, was, as matter of law, a voluntary exposure of himself to unnecessary danger.

The defendant also asked the court to instruct the jury that if they found that "Mitchell was an intelligent man, and at the time exercising his own free will, and, without any necessity therefor and with a knowledge of the danger to which he was exposed, was standing upon the platform of the car with his hands in his pockets, or upon the steps of the platform of said car while the train was being propelled by steam at a speed of about twenty-five miles an hour, then this would be a 'voluntary exposure to unnecessary danger'; and, if death resulted from the same, you will find for the defendants." This instruction was given as requested, with the addition of the words "if the jury, under all the circumstances, find that the position was, in fact, dangerous." The modification made by the court of the proposed instruction was entirely proper. It was not for the court to say, as matter of law, that the position of Mitchell when riding on the platform was in fact dangerous. The track of that part of the road over which the train passed while Mitchell stood on the platform was straight and level, and therefore the danger of being thrown from the car by sudden jerks of the train was not so great as it would have been if the road had been curved or uneven. The question as to the extent or character of the danger to which Mitchell exposed himself was a question of fact. At the trial below, the defendant itself placed numerous witnesses upon the stand, and interrogated them as to the danger of riding upon the platform of a rapidly moving railroad train. It sought to establish by evidence that it was a position of great danger. It was eminently proper that such an issue of fact should have been left to the jury.

The defendant requested the following instruction to be given:

"If you find Albert G. Mitchell was an intelligent man, and exercising his own free will, and without any necessity therefor, and with a knowledge of the dan-

ger to which he was exposed, but which danger he may not then have realized or been then thinking about, and was standing upon the platform of the car with his hands in his pockets, or was standing upon the steps of the car, running by steam at a speed of about twenty-five miles an hour, then this would be a 'voluntary exposure to unnecessary danger,' in the sense of the policies; and, if death resulted from the same, you will find for the defendants."

The instruction was properly refused, for the reason, if for no other, that it was so worded as to confuse or mislead the jury. If the assured could have had actual "knowledge" of the danger to which he was exposed, and yet did not think of it or realize it to any extent, then the object of the instruction was to affirm that the intention with which he so exposed himself was immaterial; whereas, as we have said, there could be no voluntary exposure to unnecessary danger, within the meaning of the contract, unless the assured was conscious of the danger, and intended—that is, purposely determined—to risk it. But, independently of this view, the instruction might well have been refused upon the ground that the subject had been fully covered by the general charge of the court.

There is another view of this question which is entitled to great weight. The policy expressly declares that the insurance does not cover "entering or trying to enter or leave a moving conveyance using steam as a motive power, except cable cars." It thus appears that the minds of the parties were directed to the possible conduct of the assured when about to use or when using railroad cars propelled by steam. When, therefore, the insurance company took care to declare that it would not be liable for injuries or death resulting from entering or trying to enter or leave a moving conveyance using steam, it is reasonable to hold that it did not intend to forbid absolutely riding on the platform of a railroad car, but intended to insure against all accidents arising from railroad travel other than those arising from entering or leaving a car when it was in motion, leaving every question as to "voluntary exposure to unnecessary danger" to be determined by the facts of each case. Of course, the officers of the insurance company knew, what every one else knew, that passengers on railroad cars often passed over the platforms of cars from one car to another while the train was moving rapidly, and sometimes stood or rode upon the platforms of rapidly moving cars. If the company intended to exclude liability for injuries or death resulting from voluntary acts of the assured while on a railroad car that exposed him to danger, why did it expressly except only the "entering or trying to enter or leave a moving conveyance using steam," and omit all reference to the more common occurrence of riding upon the platform of such a conveyance? The answer to this question suggests reasons, founded in justice and fair dealing, why the general words "voluntary exposure to unnecessary danger" should not be so enlarged by construction as to embrace, as matter of law, a case of riding upon the platform of a moving railroad car through mere carelessness or heedlessness, and without any purpose or apprehension of being injured or killed.

In Southard v. Assurance Co., 34 Conn. 574, it was said:

"Now, it may be said that this specific exception from the scope of indemnity of death or injury happening from causes and under circumstances expressly set forth leaves, by fair implication, death or injury from all other causes and under all other circumstances included in the contract of indemnity; thus logically inverting or complementing the maxim, 'Expressio unius est exclusio alterius.'"

And in Marx v. Insurance Co., 39 Fed. 321, 322, which was an action upon a policy similar to the one here in suit, the court said:

"As to the condition exempting defendant from liability in case of death from violating a rule of a corporation, it is said that deceased was forbidden to ride on the platform by a rule of the railroad company, which was inscribed on a metal plate on the door of the car. Whether this can be taken to be a rule of a corporation, or what shall be a rule of a railroad corporation within the meaning of the condition, is not very clear. By another condition, some limitations are imposed upon policy holders traveling by rail, as follows: 'Entering or trying to enter or leave a moving conveyance using steam as a motive power; walking or being on a railway bridge or roadbed.' Having thus defined the acts which must be avoided by policy holders in traveling on cars, I doubt very much whether another can be added under the general designation of a 'rule of a corporation.'"

While we do not rest our decision upon the ground last stated, the considerations in support of that ground tend to sustain the general proposition that the voluntary riding upon the platform of a rapidly moving railroad car, although there may be no necessity therefor, is not in itself and as matter of law a voluntary exposure to unnecessary danger, within the meaning of the contract in suit, but presents a question of fact to be determined by the jury under all the evidence before them.

It is proper to add that at the close of the general charge the court was asked by the defendant to instruct "the jury on the subject of voluntary exposure, and especially as to his knowledge of danger, that men are intended or presumed to know that which is open and plain to be seen, and to intend the natural and probable consequences of their own acts." The court replied:

"Well, that is good law. I said to the jury, in another form, that in determining whether he knew the danger, and was, to an extent, conscious of it, that they would look to whether it is one that a man of reasonable care and caution would have seen and appreciated, and from that they may infer that he knew it; on the contrary, as bearing on the same point, that they might look to the fact, if proven as a fact, that men of intelligence and reasonable care and prudence constantly rode in a position of that sort. That is a mere circumstance. It don't prove that the man who rode in the position didn't appreciate that it was dangerous."

Counsel for defendant having observed that there was evidence in the case that the deceased "had his hands in his pockets at the time, and that he also warned a little boy," the court replied:

"Yes, sir; I have said, 'Look to everything in the case,' and I meant the most minute particle of the proof. I didn't go over it all, but I presumed that, when I said they would look over it all, it was their duty to charge their memory, so far as they can, and give it consideration."

Our attention has been called to numerous adjudged cases in which the court has instructed the jury, as matter of law, that certain acts upon the part of a passenger on a railroad car constituted such contributory negligence as precluded a right of recovery

against the railroad company. The principles announced in those cases are not, in our opinion, applicable to a contract of life insurance that does not in terms exempt the insurer from liability where the death of the insured is caused by his negligence or want of due care. If an accident insurance company wishes to make it a condition of its liability that the assured shall not be guilty of negligence contributing to his injury or death, it should take care that the contract with the assured expressly so provides. The contract in suit covers the injury or death of the assured from all external, violent, and accidental means, except in the cases specifically declared in the contract not to be covered by its provisions. Bodily injury or death resulting from the carelessness of the assured is not excepted from the contract. This question was satisfactorily disposed of by Judge Clark when overruling the motion for a new trial. After observing that the law, as a matter of public policy, imposes on the carrier of passengers the highest degree of skill and caution reasonably possible for the protection of its passengers, and that, whenever the passenger's negligence contributes to bring about the accident, that is an end of the case, he said:

"On the contrary, in cases between insurer and insured, the relation is one established by contract, and this contract or policy undertakes to insure the policy holder, generally, against death or injury resulting from violent, external, and accidental means, and includes an accident resulting from the ordinary negligence of the insured, as well as that of others. The policy then provides that it shall not extend to nor cover accidents which result under special and exceptional conditions, and among such exceptions is that of an accident resulting from a 'voluntary exposure to unnecessary danger.' The policy protects the assured, then, against all violent and external accidents not embraced within one of these exceptions. The policy does not require, and the assured does not contract for, the exercise of reasonable care and caution, and no such consideration as that enters into the question except remotely and secondarily. The primary and general purpose of the contract is clearly one of insurance against accidents generally; and the question of whether the circumstances of a particular accident bring it within one of these exceptions is not a question whether the assured has exercised reasonable care or caution, nor whether he has been guilty of contributory negligence; but it is a question of whether or not the insurance company has shown (the burden being on it to do so) that the insured voluntarily and unnecessarily exposed himself to danger, and that the accident resulted in consequence thereof. And it is to be borne in mind all along that these exceptions by which the benefits of the contract may be forfeited or lost to the assured are strictly construed against the company, and liberally in favor of the assured. In fact, this principle pervades the entire law of insurance contracts of every kind whatever."

In these views we entirely concur. They are supported by the decision in Insurance Co. v. Martin, 32 Md. 310, 312, which was an action upon an accident policy. The court said:

"Nor is it a good defense that the accident was caused by the mere carelessness or negligence of the assured. In cases where the foundation of the action is an injury occasioned by the negligence of the defendant, and the liability of the latter grows out of such negligence, it is always a good defense to show contributing negligence on the part of the plaintiff; but here the liability is created by a contract, one of the chief objects of which was to protect the assured against his own mere carelessness or negligence. It has long been the universally settled construction of fire policies that they cover a loss where the fire may be caused by the carelessness, negligence, and want of due caution on the part of either the assured himself, or of his servants, agents, or tenants, because one of the prin-

cipal objects the assured has in view in effecting an insurance is protection against casualties arising from these causes. The same construction, for the same, if not a stronger, reason, must be given to a policy like the present, not only because of the character of the insurance effected, but because its positive language and the terms of the exception show that all accidents resulting from mere carelessness or negligence are insured against. The observance of due care and diligence on the part of the assured is no element of the contract on his part, and can in no way affect the right of action thereon."

See, also, Wilson v. Association, 53 Minn. 470, 479, 55 N. W. 626; Freeman v. Insurance Co., 144 Mass. 572, 576, 12 N. E. 372; 2 May, Ins. § 530.

It remains to consider the question relating to the clause of the policy exempting the company from liability if the assured was injured or came to his death in consequence of his "violating rules of a corporation." Upon this point the court charged the jury:

"If the company had a rule that the passengers were not permitted to stand on the platform of the car, and that was known to him, it was his duty to obey it; and whether it was known to him or not you may determine by looking to the fact of the extent of his acquaintance with traveling,—how much of that he had done; how frequently,—the fact that the rule was placarded on the doors of the car, if such was the fact, and whether or not it was a rule which a reasonable and prudent man would probably know. To constitute it a rule such as he is bound by, it must have been a rule which the company itself enforced, or used a reasonable effort to enforce, and it required that to keep it in force as a rule; and if the company habitually violated, or permitted it, without any effort to prevent it, to be habitually violated by passengers, then it would not be a rule which he was bound to obey. If it was known to him, and was a rule which was enforced, or a reasonable effort was made to keep it enforced, it was his duty to obey it; and, if he failed to do so, it would defeat his recovery."

The defendant excepted to this portion of the charge, upon the ground that all the evidence in the case tended to show that the railroad company had a rule forbidding passengers from riding on the platform of its cars while trains were in motion, and that the company and its agents attempted in good faith to enforce the same, and did not voluntarily permit said rule to be violated or nullified.

We think the specific objections made to the charge were met by what the court said to the jury. The objections conceded that the assured was not bound to obey any rule of the railroad company which the latter did not itself recognize as binding, and in good faith attempt to enforce. That question was fairly submitted to the jury. The court assumed, and rightly, that the assured was not to be charged with violating any rule of the company of which he had no knowledge. To this part of the charge no exception was or properly could have been taken. Whether the assured had such knowledge of any rule of the railroad company forbidding passengers to ride on the platforms of cars was left to the jury to determine upon the evidence. That was a proper disposition of the question. It was well said in Marx v. Insurance Co., 39 Fed. 321, 322:

"If, however, it shall be conceded that the railroad company had at some time prior to the death of Marx adopted a rule forbidding passengers to ride on the platform of a car, and that such rule was within the general condition of the policy referring to rules of a corporation, it was not then in force. The testimony of

the trainmen was to the effect that it was not at all observed. All passengers on the road who were so inclined, and often by the invitation of the trainmen, rode on the platforms of the cars as freely and as commonly as elsewhere. Under such circumstances it cannot be said that there was any rule of the railroad company as to riding on the platform. The cases cited to show that the consent of a conductor of a train or others in authority shall not be effectual to set aside such a rule, in so far as it may affect the liability of the railroad company for any injuries received while in that position, are not controlling. An insurance company offering indemnity for injury or death in case of accident, as to its policy holders, is not at all in the position of a carrier for hire as to its passengers. The latter is engaged in a special service of peculiar danger, as to which some rules of conduct on the part of its patrons are highly necessary. The former assumes a guardianship of its patrons in respect to the casualties of life which beset men everywhere, and as to which it is not practicable to impose limitations which shall be constantly borne in mind by the insured. Will any one say that on sea and land, at home and abroad, a policy holder must constantly consider whether he is within all the rules of all the corporations, public and private, which he may in any way encounter? Whatever the answer may be to any such question, it is plain enough that a rule of a corporation, within the meaning of this policy, must be one which is known to the policy holder, and of force at the time of the alleged violation. The evidence at the trial did not establish this fact, and the policy cannot be avoided on the ground that the deceased was not observing its terms at the time of the accident."

See, also, Railway Co. v. Lowell, 151 U. S. 209, 218, 14 Sup. Ct. 281.

We perceive no error of law in the record, and the judgment of the circuit court is therefore affirmed.