ASHENFELTER v. EMPLOYERS' LIABILITY ASSUR. CORP., Limited, OF LONDON, ENGLAND.

(Circuit Court of Appeals, Ninth Circuit. May 9, 1898.)

No. 415.

**1. ACCIDENT INSURANCE—EXCEPTING CLAUSES.**
Under an accident policy excepting from the risks "voluntary exposure to unnecessary danger," an accident is not within the exception unless the insured was aware of the danger he incurred, and purposely assumed the risks thereof.

**2. SAME—QUESTION FOR JURY.**
Whether a contractor, who was suffocated or burned to death by the ignition of a bucket of tar pitch which he was heating inside a tank for calking purposes, was aware of the danger arising from the character of that material, so as to bring him within the exception of "voluntary exposure to unnecessary danger," contained in his accident policy, *held*, on the evidence, to be a question which should have been submitted to the jury.

In Error to the Circuit Court of the United States for the Eastern Division of the District of Washington.

This was an action by Lida M. Ashenfelter against the Employers' Liability Assurance Corporation, Limited, of London, England, to recover upon a policy of accident insurance. In the circuit court a verdict was directed for defendant, and judgment entered accordingly, to review which the plaintiff sued out this writ of error.

R. J. Danson and William A. Huneke, for plaintiff in error.

L. C. Gilman, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This action was brought in the court below by the plaintiff in error against the defendant in error to recover

the amount of an accident insurance policy issued by it upon the life of one H. C. Ashenfelter, since deceased. The amended answer of the defendant admits the averments of the complaint in respect to its corporate existence, the issuance of the policy in consideration of the payment of the required premium, the death by accident of the insured, and the nonpayment of the amount for which the policy was issued. It denies the averment of proof of death, but that fact was admitted on the trial. The answer alleges the fact that the policy does not insure against "voluntary exposure to unnecessary danger," and further alleges that the accident by which the insured lost his life was caused by his voluntary exposure to unnecessary danger, and that was the real defense made at the trial. On the conclusion of the testimony, the defendant, by its counsel, moved the court to instruct the jury to return a verdict for the defendant, upon the ground that the evidence showed that the deceased lost his life by reason of having voluntarily exposed himself to unnecessary danger. The court so instructed the jury, and a verdict was returned as directed. The plaintiff duly excepted to the action of the court, and brings the case here by writ of error.

The evidence in the case shows that the deceased was a contractor of great energy and of extensive business, and, at the time of his death, was engaged in the performance of a contract with the state of Washington for the erection of buildings for its university, which were nearing completion. Among them was a large tank for the storage of water. The tank itself was 16 feet in diameter, and 17 feet high, and rested on a platform constructed upon a trestle rising 75 feet above the ground. Every ninth stay of the tank extended upward about 14 inches, and upon these stays so extended was constructed a roof having a projection of 3 feet beyond the outer edge of the tank. Through the spaces thus left, ingress and egress was had into and out of the tank by means of a ladder. The platform projected from 14 inches to several feet beyond the tank, the projection being greatest at the corners, which were square, and of which projection about 6 inches in width was occupied by a railing. For the purpose of making the tank water-tight, it became necessary to calk the seams with oakum, and to mop them with a mixture of heated pitch and tar. It was in preparing and applying that mixture that the insured lost his life. Although, as has been said, the deceased was a contractor of extensive business (the contract with the university aggregating about $117,000), the evidence shows without conflict that he was a man of such energy that, when any part of the work he had contracted for lagged, he turned his hand to it, and pushed it along, until properly under way. It was in this way that he went with a workman named Gallagher to make watertight the tank. Gallagher and he only were in the tank at the time of the fatal accident, and Gallagher's deposition was taken on behalf of the defendant, and introduced in evidence. In answer to a question asking him to describe as briefly and accurately as he could the circumstances under which the deceased was killed, the witness said:

"We started in to work on Sunday morning. He came to me before that. Harry [deceased, Ashenfelter] spoke to me on Saturday, and he said, 'Will

you 'come over and work to-morrow?' And I said, 'If there is anything pressing, I have no objection;' and he said it was. So, we came on over to the tank at ten o'clock. On going over there, he said, 'Have you been in the tank?' and I said, 'I have not.' He said, 'Come up and come in,' and we went up in the tank. There was about six inches of water in it, and we drained it out by boring plug holes in it, to keep the sediment from pouring down. There would be six inches of water there,' and we went and bored the holes in there; and Harry said, 'We must dry this tank up, so we can see what we can do with it.' I said: 'There is a salamander over to the little observatory which I used in drying the plaster on the observatory. If you want it, Harry, you can take it.' He says: 'All right; the next thing is to get it in.' We went and measured the space, and we found it was in the neighborhood of fourteen inches; and we took and flatted up the salamander, so as to get it in there. So, we put the ladder up against the tank, and looked over into the tank, and Harry said, 'The only thing we can do is to calk the tank.' The seams were a little open. And I said, 'All right; we will get in and calk it.' I said, 'There is plenty of oakum over there.' I don't know but he carried the oakum, and I got some calking irons, and started in calking, till about eight o'clock. We have two lamps in the office, and we were working with them; and he went out of the tank possibly in the neighborhood of half-past seven or eight, and I followed him; and we came over to the building, and came back Monday morning, and finished the calking. Monday, about noon, I should judge, we got through with the calking of the tank. He took no part whatever in the calking of the tank. He carried the oakum to me, and I got through calking, and he got some paints from Baker & Richards, called 'paraffine paints,' supposed to be applied on tanks for to preserve it, and also to purify the water. We looked over that material, and found it to be pretty thin. It was heavy paint, but not sufficiently heavy to cover the seams in good condition; and we concluded to put pitch on the top of the seams, or on the top of the oakum, so as to make it water-proof. So, the first kettle we heated below, and it became stiff at the time we got it into the tank. He said, 'We will use that old salamander, and we will heat the tar below, and get along with it;' and we got along Monday and Tuesday, till the accident occurred. The first knowledge I had of the fatal accident was Harry hollering to me. He said, 'Frank, hold that ladder!' And I looked down below, and I seen a blaze,—very small. It was very smoky in the tank. I saw the smoke and blaze, and started down the ladder immediately, because I knew— The first impulse was that the fire could be extinguished, and knowing that there was no means of reaching the fire, and as I rushed to the bottom, it was all igniting. It was a big sheet of flame all around me, and I used the support, and moved the ladder to the opposite side, where the exit would be to the outside, and picked up the body of Mr. Ashenfelter, which was lying on the floor, between me and the salamander. He was lying on the floor, and I picked him up, and tried to make the rim of the tank; but the fire had drove in on me so I couldn't make it, and I became partly suffocated, and I drew myself out of the tank, and that is the last I remember. I felt his body going from me, and I heard him strike the floor. I could not tell you any more till I got on the bottom of the platform myself."

Gallagher further testifies that the deceased was not in the tank much of the time while he was calking, but that he heated and prepared the mixture of pitch and tar, filled the buckets with it, and attended to the fire, and was so engaged at the time of the accident. The witness described the salamander as an open stove, made of about 16-gauge sheet iron, standing about 6 inches from the floor, on four legs, with air holes underneath, and with a grate, and, in the bottom, a pan to receive the ashes or coals. Near its top was a hole in each side, through which an iron pipe passed to hold the buckets. The witness further testified that he and the deceased were afraid to use charcoal because of the gas which would be formed by it, but

used bark, and said, "Bark is harmless, although it will cause more smoke." The witness Gallagher further testified that, shortly before the fatal fire, another fire had occurred, and, being asked how, answered:

"A. That was occurred by a bucket of tar,—one of the buckets which contained the tar or a gallon bucket; whichever it was, I don't know. I had passed the bucket down, and he was holding it over the fire; and the flames rushed out, and caught hold of the side of the bucket, and melted off this ear which is upon the bucket. The bucket upset when the ear melted off, and the fire ran down through the bottom of the salamander on the floor; and I noticed that immediately, because I was about to hand the bucket; and I slipped down the ladder, and I extinguished the blaze with the Mackinaw jacket that I had on; and then, when I had extinguished the blaze, I took the five-gallon bucket out of the salamander before it caught fire, and then I threw my jacket over the fires that were on the floor. Q. Is not tar pitch, when heated that way, likely to boil up and boil over? A. Pitch itself, after it is generated, is not liable to boil as fresh tar before it is generated, before it is heated, will. Q. This accident that occurred was one that was likely to occur, this ear of the bucket being unsoldered? Is it such an accident as is likely to occur? A. ﹖ ll, it is liable to occur, certainly. Q. Now, as I understand you, you were able to put out this fire by seeing it at once, and getting there very promptly, and slashing out the fire, and taking off the pitch? A. Yes, sir. Q. Had you been less prompt, that fire might also have been fatal? A. Well, I don't know. It would have surely have went under the same circumstances this last one did. I don't see how it could have been prevented. Q. Do you know how the second fire occurred, and what were the causes that induced it? A. Well, simply on account of the first fire causing from the ear melting off. I always presume, and still presume, that the second might have been caused by the same, and it might have been caused otherwise. The man might have fell."

The defendant introduced several witnesses to show that the method adopted by the deceased of heating the pitch and tar inside the tank was extremely dangerous; that the proper way, and the way adopted by those understanding the preparation and handling of the mixture, was to heat it on the ground, and convey it in buckets to the places of use; and the testimony to this effect is without conflict. But there is no testimony tending to show that the deceased knew this, or was experienced in the business of preparing or handling the mixture. On the contrary, there is a good deal of testimony tending to show that the deceased was not conscious of any particular danger. For example, the defendant called C. B. Smith as a witness, and asked him, among other things, this question:

"From your experience and your knowledge of this material and its use, would a prudent man, exercising reasonable foresight, have voluntarily done that work by heating the pitch on the inside of the tank?"

—To which the witness answered:

"My experience with contractors and people generally in applying that material (that is, coal tar or pitch) would lead me to state that it would be the most natural method that would be applied by a man that was not directly in that line of business, from the fact that they don't,—men that don't handle the material as a business, and have had experience, don't realize the danger there is in handling it. I have in many cases had people advise me to heat my material on the kitchen stove. Q. Assuming that it was being heated by a pail over a salamander, and that, once before the fatal accident, the ear had become unsoldered from the pail, and started a fire, and the pitch slopped over, and started a fire, what would you say as to whether any ordinarily prudent man, exercising reasonable foresight, would

have continued to do the work in that way? A. In answering that question, I would think that a man would be apt to go at it some other way. At the same time, to a man that knows how to put out a tar fire, and it does not get the best of him, and feeling confident that he can,—why, if he had already gone through one experience, and successfully put out the fire, he might think he could do it again if occasion arose, and he would hardly think that it would occur again; but an accident is apt to occur. It is a hard matter for a man that is directly in that line of business, and a man that always uses every caution to avoid against just such accidents,—it is a hard matter for him to give an opinion as to what an inexperienced man might do in a certain set of circumstances. Q. I will ask you, as a rule, whether contractors who have had experience in building, covering a period of years, including large buildings, understand the nature of this article, and the danger of using it. A. My experience has been that they know—contractors know—absolutely nothing of handling this material."

Moreover, the witness James A. Johnson, introduced by the defendant, testified, among other things, that, within 10 minutes before the fatal accident, he was in the tank, and, the fire having gone out, the deceased asked him, as his own hands were covered with pitch, and he could not get his knife, to whittle some shavings, and start the fire, and, as the witness was going down to the engine house, asked him to tell the engineer to start the pumps, adding: "By the time you get down there, I will be through with this work." The witness Smith further testifies that, as he was going out of the tank, he said to the deceased that the atmosphere in there did not suit him, or that the work was more or less dangerous (not being certain as to his language), to which the deceased replied, as he remembers his reply, "We will be done in a few minutes, and there is no danger." This reply, if made, certainly tends to show that the deceased did not regard himself as exposed to danger. It is true the testimony is that, on the occasion of the first fire, the deceased stated to Gallagher that he was almost overcome by the fumes. But it also tends to show that that fire was extinguished without difficulty and without apparent harm. Of course, the case can only be properly determined by the consideration of all of the facts and circumstances properly in evidence. But we think enough has been stated and quoted to show that the jury, under appropriate instructions, should have been allowed to pass upon the proposition as to whether the deceased knew of the danger to which he was subjecting himself, and, knowing it, voluntarily exposed himself to it. Unless he was so conscious, and purposely assumed the risk, it is plain that the case does not fall within the exception in the policy relied on in defense of the action. Insurance Co. v. Randolph, 24 C. C. A. 305, 78 Fed. 759; Association v. Hubbell (Ohio) 47 N. E. 544; Insurance Co. v. McConkey, 127 U. S. 666, 8 Sup. Ct. 1360. Judgment reversed, and cause remanded for a new trial.