**OCEAN ACCIDENT & GUARANTEE CORPORATION, LIMITED, OF LONDON, ENGLAND, v. McCLUNG.**

**No. 1312.**

Circuit Court of Appeals, Tenth Circuit.

July 20, 1936.

Edward L. Wood, of Denver, Colo. (Norman W. Baker, of Denver, Colo., on the brief), for appellant.

Frank H. Hall, of Trinidad, Colo., for appellee.

Before LEWIS and BRATTON, Circuit Judges, and VAUGHT, District Judge.

LEWIS, Circuit Judge.

This action is on an accident policy brought by the named beneficiary. It insured Rupert E. McClung, a newspaper publisher of Trinidad, Colorado, against "loss or disability resulting directly, independently and exclusively of all other causes from bodily injuries effected solely through Accidental means." It further provided:

"Special Indemnity.—Sunstroke, freezing, hydrophobia, asphyxiation, or septicæmia resulting from such injuries shall be deemed to be covered by this policy. * *

"The insurance hereunder shall not cover any loss or disability resulting directly or indirectly from: * * * disease."

The complaint alleges that Rupert E. McClung came to his death on January 20, 1934; and that his "death resulted directly and independently of all other causes through external, violent and accidental means * * * in this, that the mattress on which he was sleeping became ignited through the accidental dropping of a burning cigarette thereon, and said mattress burned and caused the death by asphyxiation of the said Rupert E. McClung." The answer put at issue the material allegations of the complaint. The trial was by jury. The sole question presented here is the sufficiency of the evidence to support the verdict and judgment in favor of appellee. No exceptions were saved to the court's charge to the jury, and no requests were made by appellant for other or different instructions.

The insured was a periodic drinker. Occasionally he went on a protracted "spree." He died on January 20, 1934. A post mortem examination held about two weeks after death disclosed an enlarged liver, an alcoholic liver. He owned a ranch about 25 miles from Trinidad to which he

went, as was his custom occasionally to do, a few days before his death. His son went out and brought him back home the day before his death. His father was drinking at that time, and went to bed when they returned about noon on January 19th. The father walked upstairs. His son remained with him during the remainder of that day and through the night until about 5 o'clock a. m. January 20th. The son was trying to taper him off by giving him smaller amounts of liquor as time went on, and was succeeding in that effort. The father was sobering and well on the way to recovery. At the hour stated his father was asleep in his night clothes and under the covers. The son had been up all night and went to his room to take a nap without undressing. He closed the door of his father's room into the hall. One window in his father's room was up six to eight inches. The son was awakened by his mother about 8 o'clock a. m., and he went immediately to his father's room. He found the room filled with smoke. His father was lying across the bed partly dressed. He had taken off his underclothing, put on his shirt, trousers, socks and shoes. He discovered the source of the smoke to be the smouldering mattress on his father's bed. His father was lying with his face about six inches from the burning portion of the mattress. A hole had been burned in the mattress approximately twelve by eight by seven inches. The mattress was composed of excelsior and cotton. The son poured water on the burning mattress, raised the window, and then with the assistance of his mother removed his father from the bed to the floor and with the assistance of another attempted to restore respiration. A doctor was immediately called, but the assured's pulsations had ceased. He was dead. The son further testified that when he went into the room the ashes of the cigarette were still more or less on the ashes of the burned portion of the mattress. The ashes from the burned portion of the mattress remained in the original shape of the mattress, and the outline of the ashes from practically the whole cigarette were on top of the ashes of the mattress. The ashes of the cigarette were directly under assured's right hand. He was lying on his right side, his head resting on his right arm. The son further testified that his father went to sleep several times during the night with a cigarette in his hand or mouth, and the son would take it from him to prevent its falling on the bed. Mr. McClung had a

habit of smoking cigarettes while in bed, and on prior occasions had set the bed or mattress afire in doing so.

The doctor, who was called early on the morning of January 20, testified that he had treated Mr. McClung on two prior occasions for intoxication to get him off of drink and quiet him down; that Mr. McClung was a strong healthy man; that when he arrived that morning Mr. McClung's body, particularly his head, was blue. Death had occurred before he arrived. He assisted in giving artificial respiration and administered oxygen, but of no avail. He formed the opinion at that time that McClung's death was caused by asphyxiation or suffocation from smoke. He was still of that opinion at the time of trial.

Another physician of Trinidad, who had practiced his profession for thirty-five years, had known Mr. McClung for many years. He gave it as his opinion that Mr. McClung died of asphyxiation; that he attended the autopsy; that all his organs were in good condition except the liver was enlarged, but in his opinion the condition of the liver was not such as to indicate death from that source.

Also two physicians testified in behalf of defendant, stating that in their opinion the autopsy disclosed no evidence of death by asphyxiation; that it was negative as to asphyxiation. Each was unable to assign any immediate cause of death. One of them further testified that deceased's liver was not in itself in such a condition as to cause death. The other said he did not come to any positive conclusion as to the cause of death, but that chronic alcoholism must be given serious consideration as the cause of death.

The body was embalmed, and the proof tends to show that that fact may have rendered it more difficult to discover the cause of death at the autopsy. An expert witness for appellant so testified.

The undertaker, who was also coroner of Las Animas County and had been deputy-coroner for six years prior to January, 1934, testified that he made some investigation of the cause of death, and in the death certificate which he signed he fixed the cause, "accidentally asphyxiated by smoke from burning mattress which was ignited by lighted cigarette." He had been in the undertaking business for twenty-four years. He lived near Mr. McClung for a

number of years, and he always appeared to be a very strong, robust man.

The principal inquiry is whether the dropping of the burning cigarette on the mattress, under the circumstances, was accidental means causing the injuries to assured which resulted in his death, within the terms of the policy. Clearly there was evidence to support a conclusion that the burning mattress caused injuries to assured which effected his death. Was the dropping of the lighted cigarette on the mattress accidental, and was there substantial evidence to support the conclusion that death resulted directly, independently and exclusively of all other causes from the bodily injuries effected thereby? If these inquiries must be answered in the affirmative, then clearly the one error assigned and now relied upon is wholly without merit.

■ The policy contains no prohibition of recovery because of the assured's negligence. Negligence on his part that caused or resulted in whole or in part in bringing about his death will not relieve from liability. None was pleaded in defense, and if made an issue it would have been one for the jury. Cooley's briefs on Insurance (2d Ed.) vol. 6, p. 5376; Zurich Gen. A. & L. Ins. Co. v. Flickinger (C.C.A.) 33 F. (2d) 853, 68 A.L.R. 161; Ashenfelter v. Employers' Liability Assur. Corp. (C.C.A.) 87 F. 682; Travelers' Ins. Co. v. Randolph (C.C.A.) 78 F. 754.

■ The assured was asleep at 5 o'clock a. m. on the morning of his death. Sometime after that, perhaps not later than 7 o'clock a. m., he arose from his bed, took off his night clothes, partly clothed himself, put on his shirt, trousers, socks, and shoes, and lighted a cigarette. He then lay across his bed, probably induced to do so from a sense of physical weakness or because he had discovered that it was earlier than he thought. His head rested on his right arm. The lighted cigarette was in his right hand. He fell asleep, and the cigarette then fell from his fingers onto the mattress and ignited it. These are the reasonable inferences and deductions from the testimony in the case.

The definition of accidental means given by Judge Walter H. Sanborn in Western Commercial Travelers' Ass'n v. Smith (C.C.A.) 85 F. 401, 40 L.R.A. 653, has been widely accepted by the courts. On page 405, of 85 F., we find this:

"An effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means."

Indeed, the assured was asleep when the cigarette fell from his fingers onto the mattress—a combination of fortuitous circumstances. The learned judge cites a number of instances of unusual accidental means which were held to be covered by policies of this kind. (1) Death from the rupture of a blood vessel caused by swinging Indian clubs for exercise. (2) Total disability caused by straining the back while lifting a heavy burden. (3) An event which takes place without one's foresight or expectation, that is, a strain of the abdominal muscles produced by pitching hay that caused an inflammation that resulted in death. (4) Death by drowning or by involuntarily inhaling illuminating gas. (5) Death caused by lock jaw which was produced by a shot wound unexpectedly inflicted by the assured himself without design. (6) A stricture of the duodenum which produced a disease causing death by jumping from a platform, two others having jumped at the same time from the same platform without any ill results. The last reference just made was to the case of United States Mutual Accident Association v. Barry, 131 U.S. 100, 9 S.Ct. 755, 762, 33 L.Ed. 60, in which the court said:

"The term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected;' that if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means."

Appellant contends assured's death was caused directly or indirectly from disease; that alcoholism contributed thereto. Chronic alcoholism is considered a disease. There was direct testimony that the immediate cause of assured's death was asphyxiation caused by breathing smoke from the smouldering mattress. There was but slight proof that it might have been caused by chronic alcoholism. There was proof that that was not the cause. With that situation in the case the appellant contends here that at between the two stated causes the jury was left to guess, one signifying liability and the other non-liability of appellant. The court instructed the jury that assured's death was caused either by asphyxiation or alcoholism according to the testimony, and that it was for them to decide whether it was asphyxiation, in which event appellant might be found liable, and if it was from chronic alcoholism defendant was not liable; that if assured was suffering from alcoholism to the extent that the alcoholism caused his death or contributed directly to causing it they must find for appellant; and that the bodily injuries must have been effected solely through accidental means and exclusive of all other causes. There were no exceptions. The jury responded by finding against appellant. That finding can not be said to have been a guess. It was based on testimony. Different theories may arise in a case requiring solution as they affect either the plaintiff's cause or the defense. When they depend on the facts and surrounding circumstances in a jury trial their solution is within the province of the jury. Occasionally the jury's action in that regard is more definitely indicated by special verdicts, that is, by special questions propounded to them by the court. That occurred in Manufacturers' Acc. Ind. Co. v. Dorgan (C.C.A.) 58 F. 945, 22 L.R.A. 620, as to how the assured came to his death in a suit on an accident policy. That was also the procedure followed in Travelers' Ins. Co. v. Melick (C.C.A.) 65 F. 178, 27 L.R.A. 629. In this case when the instructions of the court are borne in mind there can be no doubt that the jury found that alcoholism was neither the cause of assured's death, nor did it contribute thereto.

Appellant seems to put much reliance on Lincoln Nat. Life Ins. Co. v. Erickson (C.C.A.) 42 F.(2d) 997. The opinion in that case dealt with the distinction between an accidental result and the result of bodily injuries effected solely through accidental means. That and other cases like it have no application here bacause, as we have already said, appellee carried the burden by showing to the satisfaction of the jury that the death of assured resulted from bodily injuries and that those injuries were effected directly through accidental means.

We are constrained to hold that the learned District Judge did not err in law in submitting the case to the jury.

Affirmed.