## MURDIE v. MARYLAND CASUALTY CO.
### No. 2448.

District Court, D. Nevada.

Oct. 1, 1931.

Charles H. Sooy, A. A. Heer, and J. H. Sapiro, all of San Francisco, Cal., for plaintiff.

John Ralph Wilson, of San Francisco, Cal., and H. H. Atkinson, of Reno, Nev., for defendant.

NORCROSS, District Judge.

This is an action by the beneficiary upon a contract of insurance designated "Special Automobile Accident Policy," issued by defendant to one Robert Murdie. By the terms of the policy, for an annual premium of $10, subject to certain conditions specified, the defendant agreed to pay the beneficiary $5,000 in case of the death of the insured occasioned, among other causes, "By being struck or run down by an automobile." The insured, Robert Murdie, was so struck or run down on the public highway near the city of Reno on May 19, 1929, receiving injuries from which death ensued.

Two defenses are interposed. It is alleged that due notice was not given to the defendant or proofs of loss furnished as required by the policy. It is further alleged that defendant is not liable by reason of the following provision: "23. This policy shall not cover loss or injuries, fatal or non-fatal, * * * suffered while intoxicated, or while under the influence of, or affected by, or resulting, directly or indirectly, from any intoxicant or narcotic."

On May 22, 1929, a telegram was sent from Reno to the agent of the defendant company at San Francisco, reading:

"Robert Murdie accidentally killed Sunday May nineteenth nineteen twenty-nine send form for proof of death for policy number MC-seven one six two three.

"[Signed] Ernest S. Brown
"Attorney for Beneficiary."

No reply appears to have been made to this telegram. On the day following the insured's death, Joseph McIlroy, an insurance broker who wrote the policy in question, called at the office of defendant's agent at San Francisco and advised him of Murdie's death. Upon the information obtained through McIlroy an adjuster was sent to Reno to make an investigation. On May 21, 1929, on a blank form of "Proof of Death" the adjuster caused to be filled out the "Statement of an Eye-Witness," which was signed by Donald MacAfee, who was present at the time of the accident and had been with the insured for some time prior thereto. Attached to the blank form so filled out was a further statement written by the adjuster and also signed by MacAfee, and purporting to contain a more detailed account of the accident and the movements and acts of the insured for a portion of the time immediately preceding twelve or more hours. It is manifest that it was upon the statements of MacAfee thus obtained and other investigations made by the adjuster at the time that defendant took the position it was not liable under the provision (23) of the policy quoted supra. The testimony also discloses that McIlroy, acting or claiming to act under a power of attorney from the beneficiary, had a number of interviews with representatives of the defendant looking to a settlement of the beneficiary's claim.

By failing to comply with the request made in the telegram and by the independent investigations made by its adjuster, defendant is not in position to question failure to strictly comply with the provisions of the policy respecting proof of death, and its conduct is in effect a waiver. Miner v. New Amsterdam Casualty Co., 220 Ill. App. 78; Union Casualty & S. Co. v. Mondy, 18 Colo. App. 395, 71 P. 677; Phoenix A. & S. Benefit Ass'n v. Stiver, 42 Ind. App. 636, 84 N. E. 772; 7 Cooley's Briefs on Insurance, p. 5943; 1 C. J. 480.

The question to be determined upon the merits is: Was the death of the insured "suffered while intoxicated, or while under the influence of, or affected by, or resulting, directly or indirectly, from any intoxicant"? The burden of proof to establish this defense is upon the defendant. Sutherland v. Standard L. & A. Ins. Co., 87 Iowa, 505, 54 N. W. 453; Van Valkenburgh v. Am. Popular L. Ins. Co., 70 N. Y. 605; Northwestern Masonic Aid Ass'n v. Bodurtha, 23 Ind. App. 121, 53 N. E. 787, 77 Am. St. Rep. 414.

The testimony discloses that the insured, Robert Murdie, in company with two friends left his room in a hotel in the city of Reno about 8:30 in the evening of May 18, 1929, and proceeded in Murdie's automobile to Lawton's Springs, a resort located about five miles westerly of Reno, where they had dinner. Shortly after midnight on the morning of May 19th, Murdie and his party left Lawton's Springs and proceeded via Reno to Reno Hot Springs on the Reno-Carson highway about nine miles southerly from Reno, arriving at the latter place about 1 a. m. After remaining about fifteen minutes, Murdie and his party started to return to Reno. Upon turning the car from the dirt road onto the paved highway, the right rear wheel on Murdie's car was broken and the car stopped. Murdie then drove the car off of and to a point about twelve feet beyond the east side of the paved highway. Donald MacAfee, one of Murdie's companions, then walked back to the office at Reno Hot Springs, a distance of approximately a thousand feet, and phoned to Reno for assistance. After waiting for about an hour and no assistance having arrived, Murdie left the damaged car and walked to the same office and phoned to a garage in Reno to send aid. After waiting approximately another hour without the appearance of aid, Murdie, standing at the side of the paved highway to the rear of his disabled car, hailed a passing car going north towards Reno. The latter car, driven by John Turkla, stopped about forty or fifty feet beyond the Murdie car. Turkla started to back his car towards the Murdie car, but, on being informed by a passenger of the approach of another car from the south, stopped on the side of the road with the right wheels of his car in the dirt to the right of the paved highway. As the Turkla car passed him, Murdie started to walk down the right side of the paved highway towards the latter car. At a point approximately twenty-five feet from where he started, Murdie was struck by an Oakland sedan car driven by W. J. McKenzie, which also was proceeding north towards Reno. From the impact Murdie received injuries from which he died a few hours later at a Reno hospital. The fatal accident occurred about 3 a. m.

The precise point on the highway at which Murdie was struck by the Oakland sedan is

deemed of importance in determining the main question presented. E. R. Trathen, sheriff of Washoe county, who at the time was chief deputy, testified as a witness for defendant that he visited the scene of the accident about 7 a. m., approximately four hours after its occurrence. He observed skid marks where the broken wheel of Murdie's car had crossed the highway. He observed skid marks made by the stopping of the McKenzie car for a distance of ninety feet. He found shattered glass on the highway about forty feet from the skid line of the Murdie car. The skid marks of the McKenzie car started about twenty or twenty-five feet from the skid line of the Murdie car. At a point about forty feet beyond the starting point of the skid marks, the skid mark of the left wheel of the McKenzie car crossed the center line of the road and for the remaining distance of about fifty feet was to the right of the center of the road. At no time were the skid marks of both wheels of the McKenzie car to the left of the center black line. Until near the point where the skid mark of the left wheel passed to the right of the center line, the skid marks made by the right and left wheels respectively were about equal distance from the center black line— "might have been a few inches either way."

In his testimony the witness McKenzie stated that when his car reached a point near the top of a hill just to the south of where the Murdie car was parked so that the lights of his car showed down the highway, he could see the Turkla car about two hundred feet ahead; that "the man" (Murdie) was "in the center of the highway" when he hit him; that he did not see him before he hit him; that his car was "on the left hand side of the road passing another car." Respecting the location of the injury to his car by the impact, he testified, "On the right side, * * * the bumper was broken and the fender dented, and the right light off—the cowl light." The right headlight was "mashed back towards the rear."

From the location of the skid marks of the McKenzie car and the damage done to that car, it is clear that Murdie was struck by the car when he was at a point to the right of the center of the paved highway and approximately two feet or more therefrom. It is also clear from the skid marks of the McKenzie car that Turkla must have stopped his car with the right wheels off to the side of the paved portion of the highway as he testified. Murdie was undoubtedly struck by the McKenzie car at or near the point where the skid marks started, the car moving some distance in advance before the broken glass struck the pavement. Murdie's body fell in front of the Turkla car about twenty feet beyond where the broken glass was found in the road.

Upon the question of indulgence in intoxicating beverages, the testimony is to the effect that about 2 o'clock in the afternoon preceding the accident, with the two friends who were with him at the time thereof, at Murdie's room in a Reno hotel the latter took two and possibly more drinks of gin. Witness MacAfee's recollection was that he took two but not more than three drinks of what he believed was straight gin. Witness Fodrin's recollection was that he had more than two drinks; that he had "several"; that they were not "straight" drinks; that she believed they were mixed—"imagine orange juice." At about 6:30 in the afternoon of the same day the same parties with other friends were again in Murdie's hotel room, at which time the witnesses testified Murdie took one or two drinks. The three then went to Lawton's Springs, where they had dinner about 9 o'clock. Prior to the dinner Murdie had another drink—a "gin cocktail" or "gin highball." Another drink was indulged in during the course of the dinner. Following the dinner, which was concluded about 10:30, the parties remained at the resort until shortly after midnight. The witnesses engaged in dancing, Murdie dancing a few times. During the time following the dinner until midnight the witness MacAfee was positive Murdie took five or six drinks and that he might have taken as many more. The witness Fodrin could not account for so many, but was sure of one or two. The witnesses were in agreement that no intoxicants were indulged in after leaving Lawton's Springs about midnight.

From the testimony of Miss Fodrin, a witness for defendant, appears the following:

"Q. What would you say was Colonel Murdie's condition as to intoxication? A. I should say he was happy.

"Q. As to happy you mean what intoxicants had made him happy? A. Well he was always more or less a man of that type.

"Q. What do you mean by happy? A. He was in a jovial frame of mind.

"Q. He was in a jovial frame of mind from the intoxicating drinks he had taken? A. He was always a man of that type."

At this point the witness was shown a

statement made to defendant's adjuster on May 21, 1929, and asked if her signature was attached, to which she replied it was. Whereupon the following appears in the transcript of testimony:

"Q. I will ask you now what Colonel Murdie's condition was as to intoxication at the time the accident occurred? A. He was very happy.

"Q. Was he happy drunk? A. Yes."

Upon cross-examination the witness testified:

"Q. What do you mean by happy drunk? A. Very jovial frame of mind.

"Q. Do you know what drunk means? A. I have not a very clear idea of what drunk or intoxication means.

"Q. Would you say Colonel Murdie was drunk at the time of the accident? A. I would say he was capable of knowing what he was doing."

In the "Statement of an Eye-Witness" given by MacAfee to defendant's adjuster appears the following printed question: "6. Was he under the influence of intoxicants when injured?" The answer as written is: "Slightly, but he was not 'blind' or 'staggering.'" In the written statement attached to the one last-mentioned appears the following: "We left shortly after midnight and Murdie did not look like he was carrying a great deal of liquor. I think he did not have more than ten or twelve drinks, and he was one who could drink and stay quite sober, for he had been accustomed to liquor all his life. * * * To my knowledge he was not staggering when he went out to hail the passing car, and I cannot say whether the influence of the liquor was so great that it was the cause of the accident."

In the testimony of MacAfee appears the statement that while at Lawton's Springs Murdie "danced with several people" and danced "perfectly all right." The witnesses MacAfee and Fodrin were in accord that at Reno Hot Springs preceding the accident they noticed nothing unusual or out of the ordinary in the way Murdie walked or in his conversation. Miss Fodrin, however, testified that for a time he walked "aimlessly" about the car and that she cautioned him to keep off the highway. He did keep off the paved highway until he hailed the Turkla car, and whether, under the circumstances, he appeared to some one else to be walking "aimlessly" about would be an expression of opinion entitled to very little, if any, weight. Miss Fodrin also testified that about the time

Murdie started to walk to the Turkla car she said to him, "Be careful, Bob," and told him "a car was coming" because she "heard a car coming"; that at the time of making that statement Murdie "was just about on the highway." The witness was in the front seat of the stranded car, and assuming the correctness of her location of Murdie, he was about fifteen feet distant. There is, of course, no means of knowing if Murdie heard the warning statement. MacAfee, who was in the car, could not remember hearing this particular warning. In the accounts of the accident by the various witnesses, the court should not lose sight of the fact that the major events immediately connected with the accident occurred within a few seconds' time. If McKenzie's estimate of the distance—(two hundred feet) from the point where the lights of his car coming over the hill brought into view the Turkla car is substantially correct, and he was driving at a speed no greater than estimated by MacAfee (forty or fifty miles an hour), Murdie was struck within three seconds thereafter. Testimony of witnesses concerning incidents of a sudden tragedy like the one in question are so frequently at variance or in error due to the excitement occasioned that the credence to be given thereto is to be determined as far as possible by comparison with established physical facts. For illustration, according to the testimony of MacAfee, Murdie was "standing sideways" to the Turkla car "facing the driver's seat" when struck by the McKenzie car. Turkla was sure Murdie had not reached his car at the time the latter was struck. The skid marks and the location of the broken glass confirm Turkla's recollections. Concerning the testimony of McKenzie, counsel for defendant in their brief say: "The only inference to be drawn from this evidence is that the decedent suddenly stepped from the right side of the black line directly on to the path upon which McKenzie was traveling and stepped so suddenly that McKenzie was not able to see him in the prevailing light until the time of the impact." The skid marks make apparent the error in this testimony.

Jim Chickse, a witness for plaintiff, testified that he was in charge of the office at Reno Hot Springs, and was present when Murdie called to telephone shortly preceding the accident; that he had known Murdie for about a week prior thereto; that Murdie remained at the office about fifteen minutes; that because the office was on a suburban line it took some time to get the garage at

Reno; that Murdie told him about the accident to his car and he heard his phone conversation. To the question, "Would you say at that time he was drunk or sober?" the witness answered: "Sober as anything could be to me." To the question, "Would you say he was under the influence of intoxicating liquor?" he answered: "No." The witness testified there were six steps to the office floor and that he observed Murdie go up and down them—"straight as can be."

The doctor and nurse who attended Murdie at the hospital following the accident testified they did not detect an odor of liquor on his breath. The nurse further testified that if Murdie had been drinking "early in the evening" that "we would not have detected it."

At the time of the fatal accident the insured was a man thirty-nine years of age, six feet three inches in height, and weighed one hundred and eighty pounds. It is conceded he had served with distinction throughout the World War as a member of the Princess Pat Canadian Regiment. His war service, of course, is not material further than possibly it may indicate to some extent his normal mental and physical attributes. There was no testimony indicating he had suffered any ill effects from his military service, and apparently he was a man normally in robust physical health at the time of the accident.

█ Counsel for defendant concede, to quote from their brief, "the general proposition that where a policy reads it will be avoided if the insured is under the influence of intoxicants, the influence must result in a substantial impairment of the insured's judgment." Counsel, however, in their brief contend: "But in the case at bar we are not concerned with the question whether or not decedent was 'under the influence' but we are concerned alone with the question whether he was or not 'affected by' the intoxicating liquors which he had admittedly drunk." It is further contended that: "It is plain that the policy is avoided if the decedent was affected in the slightest degree by any intoxicant."

The court's attention has not been directed to any authority supporting counsel's contention last above quoted. As they appear in the policy in question, the words are used in a sense similar to the preceding expression, "under the influence." As said in Ryan v. Carter, 93 U. S. 78, 84, 23 L. Ed. 807, the word "'affect' is often used in the sense of acting injuriously upon persons and things." It would be unreasonable to hold that the word as it appears in the policy was used in any other sense.

Considering a policy using the identical language expressed in the policy in suit, the Court of Appeals of Kentucky, in Campbell v. Fidelity & Casualty Co., 109 Ky. 661, 60 S. W. 492, 495, apparently found no occasion to make any distinction between the expression "affected by" and the expression "under the influence of." The court said: "The language, 'while under the influence of or affected by intoxicants,' in the first of the separated exceptions, is clearly susceptible of two interpretations. Strictly and literally, it would include being under the influence of liquor to any extent; and, as aptly said by one of the witnesses, 'when you take one, you are under it some, and when you take two, more.' But in ordinary acceptation it does not mean that. It means being so far under the influence as to constitute a state of intoxication, and it has thus uniformly, as we think, been construed by the courts."

█ Counsel for defendant are correct in their contention that under the language of the policy the defendant is not required to establish that the accident was occasioned by the defendant being under the influence of, or affected by, an intoxicant; that it is sufficient if such condition is established irrespective of whether it is further shown that the condition was a contributory cause of the accident. Order of U. C. Travelers v. Greer (C. C. A.) 43 F.(2d) 499; Flannagan v. Provident Life & Acc. Ins. Co. (C. C. A.) 22 F. (2d) 136.

The ultimate question which the court is called upon to determine is whether it can be said to be established as a fact that because Murdie had taken five or six or possibly more drinks of gin in some form, probably in conjunction with some other nonintoxicant liquid such as ginger ale or orange juice, in a period of about one hour and a half preceding midnight, had taken two other similar drinks in the preceding hour and a half, and had during the seven hours preceding the time last mentioned taken from four to six such drinks, he was so affected by the intoxicating liquor thus consumed as to impair in any degree his ability of protecting himself against accidents at about 3 a. m. the following morning.

The court has received no enlightenment from expert witnesses as to the effect which such an amount of alcohol as may be assumed was contained in the number of drinks accounted for would have upon the insured at

midnight when the drinking ceased. At no time can it be or is it seriously contended that Murdie was drunk under any definition of that term. Assuming that it may be said he was under the influence of, or affected by, the intoxicating beverage consumed at about midnight when he left Lawton's Springs, can the court from the evidence say as a fact that about three hours later when the accident occurred he was so affected by the intoxicant as not to be in control of his normal faculties? It is not disputed that alcoholic beverages have a varying effect on different individuals. An amount of alcoholic liquor which would have a noticeably intoxicating effect on one individual would have no appreciable effect on another. The court is not aware of any rule which may be relied upon other than the appearance and conduct of the party at the time in question and for a limited period prior or subsequent thereto. The fact that in the interim of drinking the decedent had eaten a dinner, and this had been interspersed and followed with some exercise in the form of dancing, would tend to reduce the effect of the alcohol. After the last drink had been consumed there was a drive of about fifteen miles, and a little later came the accident to Murdie's car when the wheel came off. Murdie had not driven the car after leaving Lawton's Springs. At the request of Miss Fodrin he permitted her to drive. It is not intimated in the testimony that this request was made because of fear of inability of Murdie to drive the car. Apparently it involved nothing more than a desire upon the part of the young lady to do the driving. When the wheel was broken from the car, Murdie took the driver's seat and drove the car across the highway to a point where it could not interfere with traffic. The breaking of a rear wheel off an automobile nine miles from home in the early morning hours is a circumstance which may and doubtless would have some sobering influence upon one affected by an intoxicant. In the case of Brewer v. State, 23 Ala. App. 35, 120 So. 301, 302, the court said: "It is well known that occasions of sudden excitement have a tremendous sobering effect upon one under the influence of whisky; and it may well have been that this witness was drunk at the time of the difficulty, and then have been by it, and the intervening period, thoroughly sobered by the time these witnesses saw him."

The lapse of time following an established indulgence in alcoholic beverages is recognized as an important consideration in determining whether the person having so indulged is subject to its influence at a later period. So also evidence of condition at a later period may be received as evidentiary of a condition or alleged condition at an earlier period. With respect to what is a reasonable period in which sobriety would follow intoxication, the Circuit Court of Appeals of this circuit, in Johnson v. United States, 45 F. (2d) 742, 743, said: "The question of a reasonable period could not, of course, be determined with certainty by either lay or expert witnesses, and the court frankly admitted that it had no knowledge on the subject."

Following the accident to his car, Murdie appears to have spent the major portion of the next two hours in the open air. In the meantime he walked approximately two thousand feet to and from the office to telephone. His acts and conduct in all things following the accident to his car were indicative of a person in possession of his normal faculties.

In addition to the contention that Murdie stepped to the left of the center black line in front of the McKenzie car, which the skid marks show could not have occurred, the further contentions are made that Murdie should have heard the horn which McKenzie says he sounded on coming over the hill, and should have observed the lights of the approaching car. It is urged that the fact that apparently he did not do so should be taken as evidence that Murdie's faculties were impaired at the time of the accident. From the fact that McKenzie did not take the highway to the left of the center line in passing the Turkla car, the court is impressed that he may have been mistaken about sounding his horn, as he was in respect to the position of his car upon the highway. To what extent a normal person should have become conscious of a car approaching from the rear, by reason of the projection of the rays of its lights, is not, in view of all the facts, an easy matter to determine. The testimony is silent as to the character of lights on the McKenzie car. There is testimony that there was an electric light at or near the entrance to the Reno Hot Springs; of what candle power does not appear. Its purpose was to light the way of entrance. To some extent the electric light would minimize the chances of a normal person becoming conscious of an approaching car by reason of its lights, even if we may assume that a person in possession of his normal faculties would not rely on the assumption that a passing motorist would take the open left side of the road in passing Murdie and the Turkla car. The fact that it appears the accident is one which might have been

avoided, regardless of Murdie's condition, does not entitle plaintiff to recover if in fact it may be said that Murdie with unimpaired normal faculties would or should have discovered the danger in time to have avoided the accident. From the evidence submitted the court is unable to say that at the time of the accident his faculties were so impaired. The defendant has not sustained its burden of proof.

Judgment will be entered for the plaintiff as prayed for. It is so ordered.